Curia, per Dunkin', Ch.
What were the precise powers and duties of a master in chancery in England, in 1721, it is not very easy now to ascertain. By the Stat. 12 Geo. 1, c. 32, the office of Accountant General was established. This statute was passed in 1725, four years subsequent to the organization of a Court of Chancery in South Carolina. The Accountant General stands in the place of the master and usher, and is required “to do all such masters and things relating to the delivery of the suitors’ money and effects into the Bank, (fee., and keeping accounts, «fee. as by the orders of the Court of Chancery are to be done by the masters and usher. And the masters and usher were to make up their accounts with the Accountant General, and pay into the Bank all money remaining, in their hands, to be placed to the account of the Accountant General ; also all mortgages, tallies and securities, standing in the masters’s or usher’s name in trust for the suitors, to be assigned to the Accountant General.” 1 Har. Ch. Pr. 64, (edition 1796.)
The office of Accountant General has never been established in this country. But we are all of opinion that the duties required by the orders of the court in the cases of McLeod and Darby, were such as had been usually imposed on the master, or commissioner, by the practice of the court from its earliest organization. Many cases have been cited from the reports, commencing, some of them, in 1785; and the rule adopted in 1811, indicates, very clearly, what was the practice of the court, and the propriety of regulating it. It is there provided that “the master and commissioners in Equity shall, at the first sitting of their respective courts in every year, severally make report to the court of the different estates in their hands under and by virtue of any decree or order of the court, with a full and particular account of the moneys received and paid relating to the said estates.”
Now, whatever may have been the appropriate and peculiar duties of the masters in chancery in England, prior to 1721, if it had been the practice of the Court of Equity, in South Carolina, since its first organization, to impose on the master duties which more properly belong to a receiver, the master, elected under a presumed knowledge of this practice, is bound to per *174 form those duties, and for any neglect or malfeasance, the sureties on his official bond are responsible to the party aggrieved.
In a new country, and in courts of limited business, the duties of several officers are frequently united in one. In every district of the State except Charleston, the commissioner of the court is. also register.
In the Circuit Court of the United States the clerk discharges all the duties of commissioner and register in Equity. In large banking institutions there is a variety of officers, each with his appropriate duties, President, Cashier, Tellers, book keeper, &c. but in smaller institutions, the duties of cashier and teller, &c. in themselves perfectly distinct, are frequently united, and an officer, elected as cashier, is bound for any neglect or defalcation as teller. Such was the decision in Minor vs. The Mechanics Bank of Alexandria, 1 Pet. 46. Minor had been elected cashier of the bank, and given bond for the faithful discharge of his duties as cashier, but under an existing regulation of the directors, the cashier was also required to discharge the duties of teller of the bank. In an action against the surities for the default of Minor as teller, it was determined that they were responsible; the Supreme Court of the United States holding, that the official bond of the cashier must be construed to cover all defaults in duty, which are annexed to the office from time to time, by those who are authorized to control the affairs of the bank, and the sureties in a bond are presumed to enter into a contract with reference to the rights and authorities of the President and Directors under the charter, dec. So, here, the practice of the court having been to require of the master or commissioner to discharge duties which may be said to belong more properly to a receiver, both that officer and his sureties must be presumed to have contracted with reference to that practice, and are bound by it. It is not easy always to define with precision what are the duties of a receiver, as distinguished from those of a master or commissioner. Since the establishment of -the office of Accountant General, in 1725, the practice of the Court of Chancery in England can afford us no light, and the practice in South Carolina has certainly been to unite the duties in the same officer. This difficulty, and some irregularities which grew out of it, led, it is believed, to the passage of the Act of Assembly of 1821, 7 Stat. 323. As the fee bill allowed commissions to the master or commissioner only in the case of sales, and then only of ope per cent, after the first $100, it was contended, for a short *175 period prior to the adoption of that law, that in every other case, when moneys or securities for debt passed through the hands of the commissioner, he was a receiver, and not within the provision of the fee bill, and therefore entitled to the ordinary compensation of 2 1-2 per cent, on receiving and 2 1-2 per cent on paying over; and that where securities for debt were turned over, the commissioner, as receiver, was entitled to the same compensation as if money was paid by him. Nearly every clause of the Act of 1821, points to the evil and provides a remedy. It’ is impossible not to perceive that the law was passed, not in ease of the commissioner and sureties, but for the protection of the. suitor. Whenever the master or commissioner should thereafter assume the character, or claim the compensation, of a receiver, it should be his duty to shew that he had complied with the provisions of that law by giving bond and security as such. The Act also prescribes his duties, and provides his compensation, when so appointed. The fourth clause provides that “every master or commissioner in equity shall keep a book, in which he shall open and keep a regular account with every individual or estate on whose account, he has or shall hereafter receive any moneys, bonds, notes, stock, choses in action, or other property of any description whatsoever, by virtue of his office, or of his appointment as receiver,” (fee. in which account he shall credit the parties or estates with every thing received, and debit all payments on account of said parties or estates; contemplating, evidently, that the master or commissioser was still to continue to discharge the duties which had been ordinarily imposed on him, and providing that his accounts should be kept in precisely the same way when the duties were discharged officially as when they were discharged by virtue of his appointment as receiver.
The Act of 1821 was manifestly intended to afford no facility to the appointment of the master or commissioner as receiver. It may perhaps be worthy of consideration whether it ought not to be expressly prohibited by law, and a separate office of receiver created. In England it is never permitted, and for the very satisfactory reason, that the master is the proper officer to audit the accounts of the receiver. But considering the long established usage of the country, it is regarded as important for the character of the court, and due to the confidence reposed in it by the community, that, whenever the master or commissioner takes charge of funds or estates, under an order or decree of the *176 court, he should be held to act officially, and be officially responsible, unless he has, by the order or decree, been expressly appointed a receiver, and has given bond and security as required by the Act of 1821.
In regard to the estate of McLeod there can be no doubt of the original liability of the commissioner. Under the Act of 1791, 7 Stat. 259, it is made the duty of the master or commissioner, in the several districts of the State, “to make all sales under the decree of the court.” By the order of March 1823, the corhmissioner was directed to sell all the estate, real and personal, of Dr. McLeod, on the terms specified in the order. In April 1823, Mr. Elliott made the sale, and, among other things, received the bond of Dr. Whitridge, as one of the purchasers, for $17,400. For all sums received on these sales, during his official term, it is not questioned that his sureties are liable, unless they were paid away or disposed of under the authority of the court. Mr. Elliott’s term of office expired on the 28th December, 1825. Prior to that period he had received seven thous- and dollars on the bond of Dr. Whitridge, and within the following six months he received various other sums, amounting altogether to about nine thousand dollars more. In subsequent years he received small sums, amounting altogether to about six hundred dollars. The last payment was in 1833, about which time the bond was transfered to Mr. Gray. It appears by the report of Mr. Gray, that the balance appearing to be due on the bond was subsequently paid to him, and the bond delivered up to the obligor, Dr. Whitridge.
This bill is prefered by the complainant, one of the sureties of Mr. Elliott, requiring, amongst other things, that all his official creditors should establish their demands. The creditor is, of course, entitled, in this court, and under these circumstances, to rely on any breach of the condition in Mr. Elliott’s official bond. By the sixth section of the Act of 1821, it is provided “that, on the resignation, dismissal from office, or expiration of the term of office, of any master, commissioner or register in Equity, all the papers and documents appertaining to his said office, together with all the moneys, bonds, notes, certificates of stock, or other property, received and held by him under the authority of the said court, shall be delivered over by him to his successor in office, within twenty days after the date of the commission of such successorand by the last clause of the Act it is declared “that should any master, commissioner or register in Equity, *177 violate or neglect any of the duties prescribed to him by this Act, he may be punished by the Court of Equity, as for a contempt, and his official bond may also be sued by any party aggrieved by his said violation or neglect of duty.”
The bond of Dr. Whitridge was among “the papers and documents appertaining to his office,” in the possession of Mr. Elliott when his term expired. It was not delivered over to his successor within the period prescribed by law, nor for six years after-wards. In the mean time, he was enabled to hold himself out as the holder of the bond, and ostensibly entitled to receive payment of it, and did receive payment of the greater part of the bond. In the judgment of the court, the sureties of Mr. Elliott are responsible for the sums thus received by him, in consequence of this neglect or violation of duty. It is not an answer to say, that his successsor, Mr. Gray, or the obligor, Dr. Whitridge, might be required to pay these sums. If Mr. Elliott had wilfully burnt the bond, or collusively delivered it up to Dr. Whit-ridge, without payment, during his official term, could he or his sureties turn the suitor over to an action at law on a lost or destroyed bond, or to a bill in- chancery to set up the security thus improperly cancelled ? We think not. There was, or ought to have been, a surety to Dr. Whitridge’s bond, whose claim to protection might well add to the embarrassment. We do not think that a suitor should be thus driven to encounter these difficulties created by the neglect of official duty by the commissioner, for the faithful discharge of which, not the suitor,, but the sureties on his official bond, had covenanted. It may be that Mr. Elliott supposed himself entitled to retain the bond, and receive the money, either as receiver or as private agent of the parties, and that he was not bound to deliver it over to his successor, under the provisions of the Act of 1.821. But this error of judgment does not alter the consequences of the act.
The remarks heretofore made decide the question as to the liability of the sureties for the funds of the estate of, R. A. Darby. * It may be, as was suggested at the bar, that the bill was for the appointment of a receiver. The first order directed that the funds should be paid into the bank of the State as receiver. But the order of March, 1823, reciting that the previous orders could not be carried into effect, directs “ that the Commissioner -in Equity do receive all the papers and money of the estate into his hands, he giving the administratrix a receipt for the same, and that he be directed to place the money at *178 interest, and. when the claims in dispute are disposed of, to make a division among the creditors.” For the reasons before stated we think the funds received under this order were held in his official capacity. According to the decision in the Treasurers vs. Bates, 2 Bail. 362, the acknowledgement to Packard after the Commissioner went out of office, is sufficient prima facie evidence against his sureties.
The court concur entirely with the Chancellor in regard to the sales of Folly Island, and do not deem it necessary to add any thing to what is said in the decree.
So, too, in regard to the liability of the co-sureties to contribute to the complainants on account of the payment of Mrs. Mitchell’s judgment, we think the decree of the circuit court must stand. The principle on which co-sureties are bound to contribute, is thus stated by C. J. Marshall, in Lidderdale vs. Robinson, 2 Brockenb. C. C. R. 159, as the result of all the cases ; “where a person has paid money for which others were responsible, the equitable claim which such payment gives him on those who were so responsible, shall be clothed with the legal garb with which the contract he has discharged was invested, and he shall be substituted, to every equitable extent and purpose, in the place of the creditor whose claim he has discharged. This principle of substitution is completely established in the books, and, being established, it must apply to all persons who are parties to the security, so far as is equitable. The cases suppose the surety to stand in the place of the creditor, as completely as if the instrument had been transfered to him, or to a trustee for his use.” Giving to the complainants’s testator the full benefit of this principle, and placing him quoad his claim on the co-sureties, on the most favored footing of the original creditor, it has just been determined that the original creditor, Mrs. Mitchell, was entitled to recover nothing.
But it is said this payment was made by the complainants’s testator, after a trial at law, and the judgment of the court establishing his liability. On inspection of the record, which has been submitted to us, it appears that the defence offered was, that Mr. Elliott acted as receiver in this transaction ; and on that issue we have just held that the decision was .correct. But no authority was adduced here, to shew that the co-sureties were bound by that judgment, or that it was evidence of their liability. They were not parties to the record, nor does it appear that they were privies. “ It is a general rule,” says Mr. *179 Starkie (1 Ev. 195) “that a verdict shall not be used as evidence against a man where the opposite verdict would not have been evidence for him.” If Mrs. Mitchell had failed to recover against Mr. Lowndes in consequence of any defect in proof, or other cause, it is not perceived that the verdict could be given in evidence to defeat a recovery, in her actions against the co-sureties. So, if a co-surety has a receipt in full, or other satisfactory defence, it would not be contended that a verdict against the other surety could debar the use or the validity of the defence. According to Lidderdale vs. Robinson, this is the criterion ; — the co-surety takes the place of the original creditor, and may be resisted on the same principles and in the same way.
We are also of opinion that this claim for contribution must stand on the pleadings and proof already adduced. Counsel differ on the question whether this claim was resisted in the circuit court, and the defendant objects to the introduction of any new testimony. Under these circumstances, we do not think that the mere suggestion of the complainants, that a different case could be established, would warrant this court in opening the decree on this point, and directing a further inquiry.
It is ordered, that the decree of the circuit court be modified, and the account of the Master reformed, according to the principles of this decree.
Evans and Wardlaw, JJ. concurred.
Richardson, J. absent at the hearing propter invalitudinem.